**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 7, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

JOHNNY L. BASS,

        Plaintiff-Appellee,

v.

POTTAWATOMIE COUNTY
PUBLIC SAFETY CENTER,

        Defendant-Appellant,

and

JERRY GOODWILL,

        Defendant.

No. 10-6215
(D.C. No. 5:06-CV-00397-M)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MATHESON**, **McKAY**, and **EBEL**, Circuit Judges.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In this civil rights case brought under 42 U.S.C. § 1983, a jury in the Western District of Oklahoma found that Defendant Pottawatomie County Public Safety Center (the "Jail")[1] violated Plaintiff Johnny L. Bass's federal due process rights as a pre-trial detainee by acting with deliberate indifference to his safety. The jury reached its verdict after hearing evidence that Mr. Bass was brutally assaulted by another detainee while awaiting booking and classification in an intake holding cell following his arrest for driving under the influence of alcohol. As compensation for the severe injuries he suffered in the assault, the jury awarded Mr. Bass damages in the amount of $330,000, and the district court subsequently entered a judgment in favor of Mr. Bass for that amount.

The Jail now appeals, arguing that: (1) the jury's verdict in favor of Officer Goodwill is inconsistent with its verdict against the Jail; and (2) there was insufficient evidence to impose municipal liability on the Jail under § 1983 for maintaining a custom and/or policy that was deliberately indifferent to a substantial risk of serious harm to intoxicated detainees such as Mr. Bass. Exercising jurisdiction under 28 U.S.C. § 1291, we reject the Jail's inconsistent verdict claim and hold that there was sufficient evidence presented at trial to

---

[1]     As the Jail explained in its opening brief, "[t]he Pottawatomie County Public Safety Center . . . is a public trust organized under Title 60 of the Oklahoma Statutes for the purposes of the operation and management of the jail and detention facilities of Pottawatomie County, Oklahoma, and constitutes a separate and distinct legal entity under Oklahoma law."  Aplt. Opening Br. at 8 n.2 (citing Okla. Stat. tit. 60, § 176.1(A)(2)).

support the jury's finding that the Jail's policy and/or custom of commingling unclassified, intoxicated detainees with unclassified, non-intoxicated detainees at the discretion of the detention officer when the intake facility was overcrowded was deliberately indifferent to a substantial risk of serious harm to such intoxicated detainees. Accordingly, we affirm the district court's judgment and its subsequent order denying the Jail's motion for judgment as a matter of law under Fed. R. Civ. P. 50(b).

## I. BACKGROUND

Because the jury found only municipal liability under § 1983, we focus our background discussion on the salient facts pertaining to the jury's decision to impose municipal liability on the Jail for following an unconstitutional policy and/or custom in the way it detained intoxicated detainees. Because we are concerned only with the question of municipal liability, many of the specific (and hotly disputed) facts concerning the events that occurred in the Jail on the night that Mr. Bass was assaulted are not directly relevant to the issues in this appeal. We will therefore only discuss the specific circumstances surrounding the assault to the extent necessary to resolve the question of municipal liability.

For our purposes, the key evidence presented at trial was the following. First, Mr. Bass was intoxicated when he arrived at the Jail, yet Defendant Goodwill placed him in a holding cell with a non-intoxicated detainee. Given these facts and the other evidence presented at trial, the jury could have

-3-

concluded that the Jail violated the Oklahoma Department of Health's Minimum Jail Standards for housing intoxicated prisoners. *See* Okla. Admin. Code § 310:670-5-5(5) ("Prisoners who are intoxicated . . . shall be housed separately from other prisoners until such time as the medical authority or jail administrator determines their suitability for placement into general population or appropriate housing."). These standards were adopted by the State of Oklahoma as a safety measure to protect intoxicated inmates due to their impaired and vulnerable condition.

Second, while the Jail generally tried to separately hold intoxicated detainees in what was known as the "drunk pod" prior to their formal booking and security classification, the Jail had an unwritten policy and/or custom of allowing its detention officers to commingle unclassified, intoxicated detainees with unclassified, non-intoxicated detainees in the drunk pod when the intake facility was overcrowded. On the night that Mr. Bass was arrested, the intake facility was crowded, so Officer Goodwill placed Jason Grass, a non-intoxicated detainee, in the drunk pod together with four other detainees. Approximately forty minutes later, Officer Goodwill also placed Mr. Bass in the drunk pod, and, within a matter of minutes, Jason Grass viciously assaulted Mr. Bass, causing severe injuries to his face in the form of multiple broken or shattered bones.

Third, the Jail recognized that it was necessary from a safety perspective to closely supervise detainees who were waiting to be booked and had not yet

-4-

received a security classification. Specifically, the Jail had a written policy that provided as follows: "To ensure the safety of arrestees, inmates, staff and visitors, and to maintain the security of the booking area, the accepting officer supervises persons held in the booking area at all times." Aplt. App. at 237. Further, the jury was informed by Mr. Bass's expert witness that this "policy goes on . . . to say . . . that the accepting officer closely watches all arrestees in the booking area and holding cells for mood and behavior changes." *Id.* at 240-41. As the expert explained, such close supervision is necessary due to the likelihood that detainees with different security classifications (*i.e.*, minimum versus maximum) will be mixed together in the booking area and holding cells during the time they are waiting to be formally booked and classified. *Id.* at 242-43. Consistent with this testimony, Rodney Bottoms, the executive director of the Jail at the time of the events in question, confirmed the need to have policies and procedures in place that provide for close supervision of detainees at the intake facility. *Id.* at 82-83.

To summarize, the State of Oklahoma's policy against commingling intoxicated and non-intoxicated detainees and the Jail's written policy requiring close supervision of unclassified detainees together demonstrate the existence of a substantial risk of serious harm to intoxicated detainees who are commingled with other detainees prior to classification. Mr. Bass was intoxicated when he arrived

at the intake facility, he was placed together with an unclassified, non-intoxicated detainee, and he was brutally assaulted by the other detainee.

## II. ANALYSIS

### A. Inconsistent Verdict Claim.

Before addressing the evidentiary issues in this case, we must address the Jail's claim that the jury returned inconsistent verdicts. The Jail claims that, because it cannot be held liable under § 1983 for Mr. Bass's injuries under principles of municipal liability unless Officer Goodwill violated Mr. Bass's constitutional rights, *see Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) ("[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers"), the jury's verdicts are inconsistent since it returned a verdict in favor of Officer Goodwill, but still imposed municipal liability on the Jail, *see* Aplt. Br. at 8 ("Because the verdict in favor of Goodwill necessarily includes a finding that Goodwill's actions were reasonable, not deliberately indifferent to a substantial risk of serious harm to Bass, and therefore were not unconstitutional, that verdict is inconsistent with the verdict against the jail."). As the district court pointed out in its order denying the Jail's motion for judgment as a matter of law, however, "this assertion ignores the affirmative defense of qualified immunity which was asserted on behalf of defendant Goodwill." Aplt. App. at 451. It is also based on the faulty premise

that the jury necessarily found that Officer Goodwill did not violate Mr. Bass's constitutional rights.

To assert an inconsistent verdict claim, a party challenging a general jury verdict must show that they objected to the verdict prior to the jury's discharge. *See Oja v. Howmedica, Inc.*, 111 F.3d 782, 790 (10th Cir. 1997). Because the Jail failed to lodge such an objection to the jury's general verdict in this case, the Jail must show that the verdict is facially inconsistent such that entry of judgment upon the verdict is plain error. *Id.* In determining whether the verdict is inconsistent, we accept any reasonable explanation that reconciles the jury's verdict. *See Domann v. Vigil*, 261 F.3d 980, 983 (10th Cir. 2001).

We begin our analysis by noting that the Jail is not challenging any of the jury instructions that were used by the district court at the trial of this case. We also note that counsel for defendants submitted the two instructions regarding Officer Goodwill's affirmative defense of qualified immunity to the district court, *see* R., Doc. 143 at 3-4, and the district court used the instructions that were tendered by counsel for defendants when it instructed the jury about qualified immunity, *see* Aplee. App. at 18-19. Further, the instructions tendered by counsel for defendants permitted the jury to render the verdicts it returned, and the verdicts are in no way facially inconsistent.

In Instruction No. 15, the district court instructed the jury as follows with regard to Mr. Bass's failure to protect claim against Officer Goodwill:

In order to prove Plaintiff's failure to protect claim against Defendant Jerry Goodwill, Plaintiff must demonstrate by the greater weight of the evidence the following:

      1. Defendant Jerry Goodwill knew or should have known that placing Plaintiff in the [drunk pod] with Jason Grass posed a substantial risk of serious harm to Plaintiff;

      2. Defendant Jerry Goodwill was deliberately indifferent to Plaintiff's safety; and

      3. Defendant Jerry Goodwill's conduct caused substantial harm to Plaintiff.

*Id.* at 17.

The district court then gave two instructions regarding qualified immunity.

In Instruction No. 16, the court instructed the jury as follows:

If you find that Plaintiff has proven his claim, you must then consider the affirmative defense of Defendant Jerry Goodwill that his conduct was objectively reasonable in light of legal rules clearly established at the time of the incident at issue and that he is therefore not liable. This defense is known as qualified immunity.

The qualified immunity defense recognizes that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here protection of a detainee, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to what the Constitution requires as protection of detainees in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the qualified immunity defense.

*Id.* at 18. In Instruction No. 17, the court then added the following:

You are instructed that Defendant Jerry Goodwill cannot be held liable to Plaintiff in the event that you determine he is entitled to qualified immunity for his actions. If you find, after considering

all the evidence before you, that the actions of defendant Jerry Goodwill were such that a reasonable person would have believed them to be lawful and not violative of some established statutory or constitutional right, which a reasonable person would have known, Defendant Jerry Goodwill is entitled to qualified immunity.

*Id.* at 19.

These instructions clearly contemplated that the jury could find: (1) that Officer Goodwill was deliberately indifferent to Mr. Bass's safety and therefore violated Mr. Bass's constitutional rights; but (2) that Officer Bass was not liable to Mr. Bass for the violation because he made a reasonable mistake as to what the law required in terms of protecting Mr. Bass from other detainees. As the introductory sentence in Instruction No. 16 stated, "*[i]f you find that Plaintiff has proven his claim*, you must *then* consider the affirmative defense of Defendant Jerry Goodwill that his conduct was objectively reasonable in light of legal rules clearly established at the time of the incident and that he is therefore not liable." *Id.* at 18 (emphasis added). Accordingly, there is a reasonable explanation that reconciles the jury's verdicts, and the explanation is that the jury found that Officer Goodwill violated Mr. Bass's constitutional rights, as necessary to support its verdict against the Jail under principles of municipal liability, but the jury did not impose liability against Officer Goodwill because it found that he nonetheless acted reasonably and was therefore entitled to qualified immunity.

The Jail's facially appealing response to this explanation is that

> the jury could not have found that Goodwill both violated Bass's constitutional rights and that he acted 'objectively reasonably' . . . [because] a jail employee who knowingly and recklessly disregards a substantial risk of serious harm to an inmate would, by definition, be acting in an objectively unreasonable manner which would preclude a qualified immunity defense.

Aplt. Opening Br. at 11. But this argument fails for two reasons. First, if correct, this argument means that the jury should not have been instructed on qualified immunity in this case, and the Jail has never made such an argument either below or before this court. Second, it ignores the leading Supreme Court case law in this area which establishes that the reasonableness inquiry for purposes of the affirmative defense of qualified immunity is separate and distinct from the question of whether a government official had the mens rea required for the underlying constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 203-06 (2001) (excessive force claim), *overruled in part on other grounds by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009); *Anderson v. Creighton*, 483 U.S. 635, 643 (1987) (unlawful search claim).

In sum, because the jury was properly instructed that it could not impose liability on Officer Goodwill if he acted reasonably in the qualified immunity sense, even if it also found that he violated Mr. Bass's constitutional rights, the jury's verdicts were not facially inconsistent and there was no plain error.

**B. Sufficiency of the Evidence Against the Jail.**

In reviewing the sufficiency of the evidence to support the jury's verdict

against the Jail, the procedural focus of this appeal is the district court's denial of

the Jail's post-judgment motion for judgment as a matter of law under Fed. R.

Civ. P. 50(b). "[T]his court reviews de novo the district court's denial of a

motion for judgment as a matter of law[.]" *Cummings v. Gen. Motors Corp.*, 365

F.3d 944, 949 (10th Cir. 2004), *abrogated in part on other grounds by Unitherm*

*Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006). "We will reverse

only if there is no legally sufficient evidentiary basis with respect to a claim or

defense under the controlling law." *Id.* (internal quotation marks and alterations

omitted). As we have further explained:

> To overturn a denial [of a motion for judgment as a matter of
> law], we must conclude that, viewed in the light most favorable to
> the non-moving party, the evidence and all reasonable inferences to
> be drawn from it point but one way, in favor of the moving party.
> That is, the [moving party] must demonstrate that there are no
> reasonable inferences supporting the jury's verdict. In reviewing the
> record, we will not weigh the evidence, judge witness credibility, or
> challenge the factual conclusions of the jury. Most importantly, we
> may not substitute our judgment for that of the jury.

*Rocky Mountain Christian Church v. Bd. of County Comm'rs*, 613 F.3d 1229,

1235-36 (10th Cir. 2010) (internal quotation marks and citations omitted).

As set forth above, Mr. Bass was being held in the Jail as a pretrial detainee

at the time he was assaulted. The Due Process Clause of the Fourteenth

Amendment protects pretrial detainees from unconstitutional conditions of

confinement to the same extent that the Eighth Amendment protects convicted criminals. *See Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992); *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998). As a result, in the case of a pretrial detainee such as Mr. Bass, unconstitutional conditions of confinement can include violence at the hands of other prisoners if prison officials are deliberately indifferent to substantial risks of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994). Moreover, "[i]n the Tenth Circuit [a] . . . municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996) (internal quotation marks omitted).

"In this case, we review the sufficiency of the evidence against the controlling law, which we find to be properly stated in the district court's [unchallenged] jury instructions." *Rocky Mountain Christian Church*, 613 F.3d at 1236. Specifically, as relevant to the issues raised in this appeal with regard to Mr. Bass's failure to protect claim against the Jail, the jury was instructed that Mr. Bass had to demonstrate by a greater weight of the evidence that the Jail "maintained a policy and/or custom which created a substantial risk that [he] would be seriously harmed." *See* Aplee. App. at 10. Further, Mr. Bass was required to show that the Jail was "deliberately indifferent to [his] safety." *Id.* With regard to the latter showing, the jury was instructed as follows:

-12-

Deliberate indifference requires more than negligence or even gross negligence. An inadvertent failure to protect and the fact that an assault occurs is not sufficient to establish deliberate indifference. Deliberate indifference is established only if there is actual knowledge of a specific and substantial risk that Plaintiff would be assaulted and Defendants intentionally, willfully or recklessly disregarded that risk. Mere negligence does not constitute deliberate indifference.

Plaintiff, at a minimum, must establish that Defendants possessed a sufficiently culpable state of mind. In order to meet his burden of proof, Plaintiff must show that Defendants were aware of and disregarded an excessive and specific risk to Plaintiff's safety.

*Id.* at 15.

Having carefully reviewed the trial testimony and other evidence in this case, and viewing all the evidence in Mr. Bass's favor, we conclude that the jury was presented with sufficient evidence to support reasonable inferences that: (1) the Jail maintained a policy and/or custom of permitting jailors to commingle unclassified, intoxicated detainees with unclassified, non-intoxicated detainees, and the Jail's policy and/or custom created a substantial risk that intoxicated detainees such as Mr. Bass would be seriously injured; (2) the Jail was aware of the substantial risk that intoxicated detainees such as Mr. Bass would be assaulted; (3) the Jail disregarded the risk by allowing jailors to inadequately supervise the drunk pod; and (4) the Jail's deficient supervision practices were a proximate cause of Mr. Bass's injuries.

To begin with, based on the evidence introduced at trial regarding the State of Oklahoma's Minimum Jail Standards and the Jail's own internal policies

-13-

requiring close supervision of unclassified detainees, we believe the jury, relying on its own common sense and intuition, could reasonably infer that the Jail maintained a policy and/or custom that was deliberately indifferent to a substantial risk that commingled intoxicated detainees such as Mr. Bass would be assaulted and seriously injured.[2]  This does not end our inquiry, however, because, in accordance with the jury instructions, we must also determine whether Mr. Bass presented sufficient evidence to show that the Jail "intentionally, willfully or recklessly disregarded" the risk it created and was aware of.  *See* Aplee. App. at 15.  Having carefully considered the trial testimony of Christy Gunter and Officer Goodwill, and viewing this issue as part of the deliberate indifference inquiry, we conclude that he did.

Although the evidence introduced at trial showed that Christy Gunter, the booking clerk, would watch a closed-circuit television monitor that is located on her desk and hooked up to a camera in the drunk pod, Ms. Gunter testified that she only looked up at the monitor "occasionally" or "when [she] had the time." Aplt. App. at 317.  This was because Ms. Gunter had numerous other duties that she also had to perform.  *Id.* at 98-100, 314-17.  Nonetheless, Ms. Gunter readily acknowledged that commingled detainees in the drunk pod needed to be closely

---

[2]     As we have concluded, the policies and/or customs at issue in this case are sufficient in themselves to show the substantial risk of serious harm that they address.  Thus, Mr. Bass did not have to put forth evidence showing that there had been similar assaults previously at the Jail.

-14-

supervised because it was "very foreseeable" that the pod would contain a mix of maximum security detainees and minimum security detainees, *id.* at 320-21, and Officer Goodwill likewise testified regarding the need for close supervision of the drunk pod, *id.* at 151-52. According to the testimony of Officer Goodwill, however, it was difficult for Ms. Gunter to provide the needed close supervision given all of her other job duties. *Id.* at 146-47. In fact, on the night in question, Ms. Gunter did not notice that anything was amiss in the drunk pod until she observed Mr. Bass lying on the floor of the pod, which was after he was assaulted by Jason Grass. *Id.* at 334-35.

On the night Mr. Bass was assaulted, Officer Goodwill was the only other Jail employee at the intake facility.[3] During the approximately forty minutes that elapsed between the time that Officer Goodwill placed Jason Grass in the drunk pod and the time that he placed Mr. Bass in the drunk pod, Officer Goodwill was passing out meals to other detainees and performing other duties, but he testified that he was always within "earshot" of the drunk pod. *Id.* at 172, 179. But regardless of whether he was always within earshot of the drunk pod, Officer

---

[3]     Ms. Gunter testified that there normally would be one additional Jail employee who was a "roamer-type" and would go "back and forth between the county and the city jail," but she did not recall that person being on duty on the night in question. *See* Aplt. App. at 311. There was no other reference to this "roamer-type" during the trial, however, so it is not clear what the roamer's duties entailed.

-15-

Goodwill acknowledged that some form of "eye-on observation" is still necessary.

His specific testimony was as follows:

> Q. Mr. Goodwill, we have a situation where you have a crowded jail, a noisy jail, a busy night, is it your testimony that during the 40 minutes, or thereafter, that you could hear what is going on in [the drunk] pod at all times?
>
> A. A general conversation like we are having right now, probably not, but somebody whooping and hollering and yelling for help, yes, I would have.
>
> Q. Whether or not they were whooping or hollering and calling for help, there needs to be some type of eye-on observation, as well as being able to hear, would you agree?
>
> A. I understand that's what the monitors were for.

*Id.* at 196. Officer Goodwill further testified that, when he was performing his

duties of going from cell to cell throughout the intake facility to pass out meals to

other detainees, "[he] would rely on Ms. Gunter to be watching the camera."

*Id.* at 151.

Based on the testimony of Christy Gunter and Officer Goodwill, we believe

the jury could reasonably infer that the Jail's supervision practices (*i.e.*, only

"occasionally" watching the television monitor and remaining only within

"earshot" of the drunk pod)[4] were deliberately indifferent to a substantial risk that

---

[4]    The jury could reasonably infer that the conduct of Christy Gunter and Officer Goodwill reflected the Jail's relevant supervision practices because, as their testimony indicated, their conduct was a function of the official job duties assigned to them. Further, the Jail put forth no evidence suggesting that they

(continued...)

-16-

intoxicated detainees such as Mr. Bass would be assaulted. Importantly, we also believe the jury could have drawn a reasonable inference that these deficient supervision practices were a proximate cause of Mr. Bass's injuries.

With regard to causation, the most significant evidence presented at trial was the written statement of one of the other detainees who was being held in the drunk pod at the time Jason Grass was placed in the pod. As presented during the trial through a colloquy between counsel for Mr. Bass and Officer Goodwill, the statement was as follows:

> Q. (By Mr. Bisher) This statement was obtained through Mr. Glandon, the internal affairs investigator; is that correct?
>
> A. I would guess so, yes.
>
> Q. The second page of this is actually the handwritten statement of Mr. Martinez and then Mr. Glandon had it translated, did you understand that?
>
> A. Yes.
>
> Q. "On Wednesday, 6/5/03," that's the date . . . Jason Grass, and Johnny Bass were arrested, correct?
>
> A. Yes.
>
> Q. "In the evening between 6 p.m. and 7 p.m., I, Manuel Martinez, was locked up in the jail with another three young prisoners. Everybody was peaceful until another prisoner entered. He had long hair and tattoos on his body. He acted desperate. He started to scream, looked like he was talking to friends in another cell, and

---

[4](...continued)
were in any way acting contrary to the Jail's customary practices.

[was] hitting the door very hard over and over. Later, the food arrived," that's when you were feeding; is that correct?

A. I would assume so, yes.

Q. "Later the food arrived and he took two plates. He told us to take – he told us to take one of the plates he had and so I had to take the plate, because everyone had one. I was uncomfortable taking the plate. He offered me some tea and I said nicely, no. He looked at me funny and I thought he had mental problems. Later on another prisoner arrived who was older, he asked me for a place to sit. The moment the old man sat down, the man with the long hair attacked him, hitting him directly in the face." He is referring to Mr. Bass, isn't he, Johnny Bass?

A. Yes.

*Id.* at 148-49.

In response to follow-up questions regarding Mr. Martinez's description of Jason Grass's behavior, Officer Goodwill testified as follows:

Q. If somebody . . . was acting that way, would you be concerned?

A. If I had seen it, yes.

Q. Anyone who would have been able to appreciate that behavior would be able to appreciate that that person had the propensity of hurting someone, is that a fair statement?

A. If that's the way it happened, yeah.

Q. At anytime did you hear this loud banging on the door that was described by Mr. Martinez?

A. No, I did not.

. . . .

-18-

Q. Would you agree, Mr. Goodwill, that Mr. Martinez's statement, assuming that that's a credible statement and the truth of what he wrote down, that wouldn't describe someone who was calm?

A. Would you repeat that?

Q. Sure. Mr. Martinez, who described Jason Grass's behavior, banging on the door, yelling, quote, "thought he was mental," that wouldn't describe someone who was, quote, "calm," would it?

A. No, it would not.

Q. If that existed, if that behavior was exhibited, and you are aware of that behavior, you would have taken him out of the cell, right?

A. Yes, I would have.

Q. That is something that you knew to do?

A. Yes.

*Id.* at 150-51, 161.

Viewing this testimony in the light most favorable to Mr. Bass, the jury could reasonably have found that Mr. Martinez's statement was credible, and that either Christy Gunter would have seen or Officer Goodwill would have heard the commotion that Jason Grass made after he was placed in the drunk pod if they had been closely supervising the pod. By his own admission, if this had occurred, Officer Goodwill would have removed Jason Grass from the drunk pod, and it is reasonable to infer that Mr. Bass would not have been assaulted. Because Christy Gunter and Officer Goodwill were acting pursuant to the Jail's policies and/or

customs and their assigned duties, the Jail was properly found liable for the resulting assault.

The judgment of the district court is **AFFIRMED**.

Entered for the Court

David M. Ebel
Circuit Judge