Mark HAUCK, Plaintiff,

American Family Mutual Insurance Company, Intervenor Plaintiff,

v.

MICHELIN NORTH AMERICA, INC., a New York corporation, Defendant.

No. CIV.A.03–F–107 CBS.

United States District Court, D. Colorado.

Sept. 14, 2004.

Howard Flicker, Frickey Law Firm, Aurora, CO, for plaintiff.

Colin C. Campbell, Campbell, Latiolais & Ruebel, P.C., Denver, CO, Thomas Dalton McFarland, Golden, Co, Jeffrey Ralph Pilkington, Davis, Graham & Stubbs LLP, Denver, CO, for defendant.

**ORDER ON: (1) DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF EXPERT WITNESS, and (2) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

FIGA, District Judge.

This matter comes before the Court on Defendant's Motion *In Limine* to Exclude Testimony and Opinions of Robert Ziernicki (Dkt.# 53)("Defendant's Motion *in Limine*") and Defendant's Motion for Summary Judgment (Dkt.# 54).

## BACKGROUND

This case arises from a multi-vehicle traffic accident which occurred on interstate 25 near milepost 231 on July 6, 2001. Plaintiff was injured in the accident, apparently caused when a northbound Jeep Cherokee driven by Dwayne Wise went out of control, crossed the median and collided with plaintiff's southbound 1996 Dodge Van. The plaintiff's Dodge Van in turn collided with a following tractor trailer driven by Jason Lee. Plaintiff's van came to rest on the right shoulder of the southbound lanes, and the Jeep Cherokee came to rest in the median. Plaintiff was treated at Denver Health Medical Center for serious injuries. Intervenor American Family Insurance, plaintiff's auto insurer, provided PIP benefits and property insurance to plaintiff, and by its intervention seeks reimbursement from Defendant Michelin (*see* Preliminary Pretrial Order, September 19, 2003, at 3).

The undisputed facts, based on a comparison of the parties' motions and briefs, appear to reflect that at the time of the accident the 1985 Jeep Cherokee driven by Mr. Wise had a 1985 Michelin X tire on the right rear wheel. Other evidence indicates that the three other tires on the car were Trail Cutter brand radial tires. (*See* Ziernicki preliminary report dated March 21,

2002 at 3; Exhibit A1 to Defendant's Motion *in Limine.*) At some point during the accident, the tread of the Michelin tire separated from the tire. (Preliminary Pretrial Order at 2.)

## PLAINTIFF'S THEORY OF LIABILITY

According to plaintiff's theory of the case, the tire tread separation caused the accident and plaintiff's resultant injuries. Plaintiff has asserted four claims for relief against defendant Michelin: a claim for strict liability which alleges manufacture of a defective tire; negligence in the manufacture of the tire; and breaches of warranties of merchantability and fitness for a particular purpose (Complaint, filed January 16, 2003).

In support of his theory, plaintiff has tendered Robert Ziernicki, Ph.D., as an expert witness on the cause of the failure of the tire on the Wise vehicle. From a review of the record it appears that Dr. Ziernicki tendered the written preliminary report of March 21, 2002 and gave his deposition on November 10, 2003. A brief summary of Dr. Ziernicki's opinion is that the tire delaminated due to an "adhesion defect," meaning something was wrong with the way the layers of the tire were "bonded" together. He admits in his deposition that he cannot specify the precise cause of the adhesion defect, but asserts that the defect was present at the time of manufacture, and was not due to later damage to the tire, misuse of the tire, or under- or over-inflation of the tire.

## DEFENDANT'S MOTIONS TO STRIKE EXPERT WITNESS AND FOR SUMMARY JUDGMENT

On December 31, 2003, defendant Michelin filed the instant motion to strike Dr. Ziernicki's opinions based on the Supreme Court decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd., v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). On the same day Michelin filed its motion for summary judgment.

In its *Daubert* motion Michelin essentially argues two points. First, Michelin argues that Dr. Ziernicki is not qualified to give an opinion in this case, as he admits that he is not an expert in tire design or tire manufacture. Second, Michelin argues that his opinion is not based on acceptable sound scientific methodology or reasoning. Michelin essentially contends that Dr. Ziernicki did not run any kind of tests on the tire, is not familiar with the manner in which the tire was manufactured, and has not properly eliminated other possible causes of the tire's delamination. Michelin also advances a related third point in its motion: that since Dr. Ziernicki cannot state the cause of the "adhesion defect" from which he claims this tire suffered, he has not provided evidence relevant to a claim for strict liability for a manufacturing or design defect.

This third point is also the basis for Michelin's motion for summary judgment. In that motion Michelin argues if Dr. Ziernicki's opinion is rendered inadmissible pursuant to its motion *in limine*, plaintiff has come forward with no admissible evidence of a defect in the manufacture or design of this Michelin tire, and therefore cannot prevail on any of the claims alleged in his complaint.

Plaintiff responded to both motions on February 10, 2004. In response to the motion for summary judgment, plaintiff argues that the motion depends on the outcome of the defendant's *Daubert* motion, but states that plaintiff's case is "founded upon the testimony of" Dr. Ziernicki (*see* Plaintiff's Objection to Summary Judgment, p. 2). Plaintiff separately filed an opposition to the motion to strike Dr.

Ziernicki's opinions, and attached to this opposition a lengthy affidavit by Dr. Ziernicki that appears to be a more detailed presentation of his opinions. It appears that there may well be additional opinions presented in that affidavit beyond what was contained in the preliminary report and the deposition testimony. However, defendant does not complain that such supplemental disclosures conflict with F.R.Civ.P. 26(a) and so this Court will not address that issue.[1]

In its reply filed March 10, 2004, defendant maintains its position that Dr. Ziernicki is not qualified; has not properly eliminated other possible causes of this tire's failure, and instead has reached his position by a simple *ipse dixit*, contrary to the requirements set forth for an admissible expert opinion in *Kumho Tire*.

On September 1, 2004, this Court conducted a *Daubert* hearing on defendant's motion *in limine*. The Court heard the direct testimony and cross-examination of Dr. Ziernicki, received into evidence articles and information tendered by plaintiff, viewed the actual delaminated tire and its separated tread, and heard arguments of counsel for the plaintiff, the intervenor and the defendant both on the motion *in limine* and on the motion for summary judgment.

Based on all the information presented to it, this Court concludes that the motion *in limine* should be and hereby is GRANTED, and that the motion for sum-mary judgment is also GRANTED, for the reasons set forth below.

## ANALYSIS OF MOTION *IN LIMINE* AS TO THE TESTIMONY AND OPINIONS OF DR. ZIERNICKI

■ Federal Rule of Evidence 702 imposes upon the trial court a "gate-keeping" function with respect to the admissibility of expert opinions. *Daubert, supra,* 509 U.S. at 589–90, 113 S.Ct. 2786. To perform the gate-keeping function, the Court performs a two-step analysis, first determining whether the expert is qualified by "knowledge, skill, experience, training, or education" to render the opinion, and second to determine whether the opinion rendered is "reliable" under the principles set forth in *Daubert* and *Kumho.* *See, e.g., Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 969 (10th Cir.2001).

■ When the factual basis, data, principles, methods or their application contained in an expert's opinion are sufficiently called into question, the trial court must determine whether the opinion has a "reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire, supra,* 526 U.S. at 149, 119 S.Ct. 1167. To be reliable under *Daubert* and its progeny, an expert's scientific testimony must be based on scientific knowledge, which " 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported

---

1. According to the preliminary pretrial order, all expert discovery in this case was to be completed by October 31, 2003. If the February 2004 affidavit contains additional opinions not set forth in the written report, it seems to present an issue as to whether it would be admissible, and whether, under Rule 26(a)(2)(B), plaintiff's expert witness disclosures were adequate. As the court stated in *In re TMI Litigation,* 199 F.3d 158 (3d Cir.2000), the scheduling of a *Daubert* hearing "certainly does not establish that a District Court must provide a plaintiff with an open-ended and never-ending opportunity to meet a *Daubert* challenge until plaintiff 'gets it right' and it certainly does not establish that a plaintiff must be given the opportunity to meet a *Daubert* challenge with an expert's submission that is based on a new methodology completely different from the one the expert originally engaged in." 199 F.3d at 159. Nevertheless, no challenge has been raised by defendant to the supplemental materials proferred by plaintiff.

speculation.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir.), *cert. denied*, 540 U.S. 1003, 124 S.Ct. 533, 157 L.Ed.2d 408 (2003) quoting from *Daubert, supra*, 509 U.S. at 590, 113 S.Ct. 2786. As the Tenth Circuit has stated, the *Daubert* opinion identified four nonexclusive factors that may be considered by the trial court in assessing the reliability of the expert's opinion:

(1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Dodge, supra*, 328 F.3d at 1222 citing to *Daubert, supra*, 509 U.S. at 593–94, 113 S.Ct. 2786. The list is not exclusive, and district courts applying *Daubert* have broad discretion to consider a variety of other factors. *Dodge, supra*, 328 F.3d at 1222. The particular circumstances of each case determine which of the factors are applicable. *Id.*

A summary of Dr. Ziernicki's opinions is necessary to determine whether he is qualified to render such opinions, as well as to determine whether the opinions are reliable in light of these identified factors.

In his preliminary report, Dr. Ziernicki states that he performed a "visual and tactile examination of the exposed portion of the tire and tread." (Ex. A1 to Defendant's Motion in Limine, at 2.) He states that "[f]urther work could include more extensive examination of the tire with all parties present." (*Id.*) It appears that Dr. Ziernicki had custody of or access to the tire and could have performed further "examination" of the tire, but he testified at the *Daubert* hearing that he performed no tests on the tire carcass, or its tread, beyond what is discussed in his initial report.

Dr. Ziernicki also states that he inspected the spare tire that was still on the Jeep Cherokee and found it to be a "relatively new" Trail Cutter radial tire with slight rim damage. (*Id.*, p. 3.) He opined that although the Cherokee was equipped with three Trail Cutter tires, and one Michelin X tire, the "construction and size of the tires are similar" and the slight differences did not contribute to the Michelin failure. (*Id.*)

Dr. Ziernicki states that he inspected the damaged tire and found "no signs of under or over-inflation prior to the rollover accident" and therefore concluded that the tire was properly inflated and was not overloaded prior to the accident. (*Id.*)

He also states that the "tread of the tire completely separated from the body of the tire" and approximately 75% of the tread was recovered. According to Dr. Ziernicki, the majority of the remaining tread "displays adequate tread depth and is in good condition." (*Id.*) Although he does not so state in his written report, or in his later affidavit, he testified at the hearing that he believed the damaged tire had only 4000–5000 miles of wear and should therefore not have delaminated but for a defect.

Dr. Ziernicki also states in his report that a portion of the tread had "reduced tread depth as a result of high, localized wear." (*Id.*) He further acknowledges that this indicates the tire experienced impact damage at this location where the tread wear was uneven. (*Id.* at 3–4.) He concludes that the "impact occurred some time and distance prior to the tread separation and final failure of the tire." (*Id.* at 4.)

Dr. Ziernicki also opined that the outboard shoulder of the tire exhibited abnormal wear for approximately 20% of the circumference of the tire, indicating what he calls "tread looseness." He opines that the tread looseness is the result of "an adhesion problem created during the manufacturing process." (*Id.* at 4.) He then reaches the conclusion that "the extent of the uneven wear in the shoulder of the tire shows that an adhesion defect existed in the tire prior to the minor impact the tire sustained." (*Id.*) He states that "an impact in the area of the adhesion defect further weakened the bond between the tread and the body of the tire resulting in tread delamination." Finally, he concludes:

> during the lifetime of the tire it should be expected that the tire would sustain an impact with an object such as a rock lying in the roadway. The tire manufacturer should design the tire to withstand such an impact. Therefore this engineer concluded that the probable cause of the tire failure was an adhesion defect created during the manufacturing process.

(*Id.*)

In the affidavit submitted by plaintiff in response to the Motion *in limine,* Dr. Ziernicki presents in a more detailed and systematic way his efforts to exclude other causes of the tire failure other than the "adhesion defect." *See* Ziernicki Affidavit, ¶¶ 2.3, 2.4, 2.6, and 2.7. The affidavit also specifies, apparently for the first time, the kinds of manufacturing defects that Dr. Ziernicki believes can lead to "adhesion defects" such as incomplete vulcanization of the uncured tire; and design defects such as "failure to minimize the strain state at the belt edge." Ziernicki Affidavit, ¶ 2.3. Dr. Ziernicki does not hypothesize, or appear to specifically rule out these causes. Rather he states that:

> To determine the exact cause of the adhesion defect would require precise knowledge (on the day the Michelin X tire was manufactured) regarding the manufacturing methods, conditions of the material used at the time of manufacture, design drawings of the intended construction of tire, and statistical analysis of a population of the same tires. Therefore, I concluded that determination of the exact cause of the adhesion defect would not be practical.

Ziernicki Affidavit, ¶ 2.9.

*Michelin's Challenge to Ziernicki's Qualifications*

■ Michelin points out, as noted above, that Dr. Ziernicki admits that he is not an "expert" in tire design or tire manufacture. He testified to as much at the *Daubert* hearing, specifically acknowledging that he has never worked in a tire plant or consulted on tire compounds or specifications. He admitted that he was not qualified as an expert to give opinions regarding tire design or tire manufacture. He displayed a lack of knowledge regarding the component parts of a tire and their interrelationship. He conceded that he was not familiar with the chemical or thermal elements of the tire manufacturing process, the curing or vulcanizing of tires, the construction of belt edge gum strips for tires or the compounds used in manufacturing tires. He also testified that he had never performed testing on a tire to determine the cause of belt or tread detachment.

Dr. Ziernicki testified that he agreed that the manufacture of steel-belted radials is a complex scientific process, and he never analyzed the Michelin tire from the perspective of how it was built. He never states, and in fact admits, that he does not know the cause of the purported "adhesion defect" that he claims occurred during the manufacturing process. In his deposition,

and in his testimony in open court, Dr. Ziernicki repeatedly admitted that he did not know what caused the adhesion defect, and would not provide an opinion on the matter. Since he has no theory as to what caused the purported "adhesion defect," he can point to no problem in the Michelin manufacturing process that was "defective."

Plaintiff, in response, argued that Dr. Ziernicki is an expert on "tire failure" and that one need not be a designer or manufacturer of tires to give an opinion as to why a tire failed.

In support of its position that Dr. Ziernicki is not qualified to give the opinion he offers, Michelin cites to the decision in *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F.Supp. 1353 (D.Ariz.1996), *aff'd* 114 F.3d 851 (9th Cir.1997), in which the district court found a proposed tire failure expert to be not qualified to provide helpful opinions, excluded his testimony, and granted summary judgment for the tire manufacturer. There, as here, the tire failure expert sought to testify that a tire separated because of an "adhesion defect." There, as here, the expert could not point to the particular manufacturing defect, and had no experience in the mechanical, chemical or thermal components that go into the process of manufacturing tires. 919 F.Supp. at 1356–57. (The facts and issues in *Kumho Tire* itself are also similar to those of this case.)

This Court agrees with defendant's position, and finds based on the evidence set forth above, that Dr. Ziernicki does not possess the requisite qualifications to give the ultimate opinion he offers in this case, namely that the tire at issue here was defectively manufactured. In reaching this conclusion, the Court is not saying that Dr. Ziernicki is unqualified to give any of the opinions offered in his report. He may well be qualified to state, for example, that the tire does not display signs of under-inflation, over-inflation or puncture. He may also be qualified to state that the tire does not show signs of overloading or owner misuse. He also may well be correct that impact damage to the tire occurred right before the accident. However, to be qualified in one area of a discipline or science does not necessarily demonstrate that the tendered expert is qualified in other areas of the discipline. *See, e.g., Ralston, supra,* 275 F.3d at 969–70; *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1088 (10th Cir.2001), *cert. denied,* 535 U.S. 928, 122 S.Ct. 1298, 152 L.Ed.2d 210 (2002). Dr. Ziernicki does not have the qualifications, experience, knowledge or training to reach the ultimate conclusion that he offers, as explained below, namely that this tire was "defectively" manufactured.

*Michelin's Challenge to Reliability of Ziernicki's Opinions*

In addition to his lack of expertise, this Court finds that Dr. Ziernicki's opinion is not reliable in accordance with the application of accepted technical principles or methodology.

■ What Dr. Ziernicki attempted in this case was to rule out possible causes of the delamination, besides a manufacturer's defect. Neither the defendant nor this Court takes issue with the methodology of ruling out other causes by the process of elimination. But the application of that methodology by Dr. Ziernicki is not sufficiently reliable in this case.

Dr. Ziernicki admitted in his testimony that tread or belt detachment can occur on a tire through no fault of the tire manufacturer and that there are a number of causes for tread or belt separation other than design or manufacturing defect, including punctures, under-inflation, over-inflation, overload, over-deflexion, improper

repair, mounting damage, valve stem damage, corrosion in the belt package, exposure to chemicals or heat and excessive high-speed operation. He also testified that impact damage to a tire could cause tire delamination. Therefore, he sought to rule out these other causes, leaving only a manufacturing defect as the possible cause.

It was apparent at the *Daubert* hearing that the parties to this case are not in dispute that the damaged tire did not delaminate due to the causes such as under-inflation, over-inflation, puncture or overloading. The main point of dispute is whether the prior impact damage to this tire, which all parties agree occurred before the accident in question, caused the delamination which resulted in this accident. Dr. Ziernicki opined that the impact damage was not the cause of the tire delamination.

In reaching this opinion, Dr. Ziernicki relied on the fact that the damaged tire displayed what he referred to as "global" or "total" delamination. Dr. Ziernicki stated in his report, and testified at the hearing, that such "global" or "total" delamination would not occur if the cause was "localized" impact or damage, as had been incurred on this tire, and as Michelin appears to contend. He therefore ruled out the possibility that localized damage was the cause of the tire, and therefore the cause must have been a manufacturing defect.

This opinion appears to the Court to be unreliable for two distinct reasons. First, Dr. Ziernicki has not performed any testing of tires, nor referenced any reports of testing of tires, to replicate the global delamination that occurred here, or to demonstrate that such delamination cannot occur in a impact damaged tire. Thus, the meth-

odology flaw in this case, bears similarities to the flaws of the expert in *Truck Insurance Exchange, v. MagneTek, Inc.,* 360 F.3d 1206 (10th Cir.2004), where plaintiff's expert was not permitted to opine as to the conditions which caused the fire at issue there due to an unreliable methodology applied unreliably to the facts of that case. See 360 F.3d at 1211. Nor does Dr. Ziernicki provide or refer to any persuasive technical literature or any recognized authority to support the underpinnings of his theory, or to show that "global" delamination would not occur from localized impact damage is a recognized principle in the technical community.

When challenged to identify technical literature or authority to support this view, Dr. Ziernicki cited to three publications: a set of tire standards published in the Code of Federal Regulations (CFR), an article referred to as the "Pirelli" article and a study by the National Highway Traffic Safety Administration ("NHTSA") of the Firestone Wilderness AT tires.[2] The Court has reviewed these articles, in conjunction with Dr. Ziernicki's testimony, and finds that none of the three publications specifically refer to the concept of "global" or total delamination, nor do they provide scientific or technical support for the proposition Dr. Ziernicki advances.

It is true that the standards published in the CFR state that after testing "[t]here shall be no visual evidence of tread, sidewall, ply, cord, innerliner, or bead separation, chunking, broken cords, cracking or open splices." 49 CFR § 571.109 S4.2.2.5(a). However, the regulation does not specifically address the possibility of "global" delamination occurring in a locally damaged tire. In fact, the standards published in the CFR refer to "new pneumatic

**2.** These documents are appended as exhibits 27, 28 and 24, respectively, to Dr. Ziernicki's affidavit filed with plaintiff's opposition to the motion *in limine*.

tires," whereas the tire at issue here was at least 16 years old, had some wear although the amount is not definitive, and admittedly had some impact damage to the tire. Further, the regulation specifically states that it does not apply to any tire which has been altered so as to render impossible its use, or its repair for use, as motor vehicle equipment. 49 CFR § 571.109 S2. The regulation also states that the testing shall be performed "using a test rim that undergoes no performance deformation." 49 CFR § 571.109 S4.2.2.5. The parties to the case here admitted that the rim on which the tire at issue had been mounted was a damaged rim.

Dr. Ziernicki cites to the "Pirelli" article for the proposition that "[i]n view of the importance of tire to vehicle safety, it is specifically designed so that it comes to the end of its life-cycle because of tread wear and not because one of its parts fail." Ziernicki Affidavit, ¶ 4.1. While this proposition may well be true, it sheds little or no light on the possible circumstances where "global" delamination may or may not occur.

Finally, Dr. Ziernicki claims that the NHTSA study of the Firestone Wilderness AT tires provides technical support for his opinion regarding global delamination. Dr. Ziernicki does not reference any of the written contents of the NHTSA study, but rather includes in his affidavit photographs of Firestone Wilderness AT tires in figures 5 and 6A of his affidavit, which he states he reproduced from the NHTSA study. Dr. Ziernicki "visually" compared the delaminated Firestone tires displayed in the NHTSA report, and states that the damaged Michelin X tire in the instant case displayed a similar appearance or pattern of delamination. See Ziernicki Affidavit, ¶ 3.12. The photographs at least superficially suggest similarities between the tire delamination in this case and the Firestone tire failures that arguably were due to design defects.

Dr. Ziernicki, however, testified that he did not ever physically inspect any of the Firestone tires discussed in the NHTSA study. He also admitted that he did not know what compounds or materials were used in the Firestone tires. Nor did he ascertain whether the Firestone and Michelin tires used similar or different compounds. Rather, based solely on his visual comparison, Dr. Ziernicki concluded that since the NHTSA report states that the Firestone Wilderness AT tires showed poor adhesion within the shoulder of the tire at the belt edge, the Michelin X tire also had a "global nature of adhesion problem" which shows that "the adhesion problem is a result of a manufacturing or a design defect, rather than associated with the impact to the tire." (*Id.*)

The Court does not find this type of analysis provides reliable technical or scientific principles to support Dr. Ziernicki's conclusion that global delamination will not occur as a result of prior impact damage to a tire. Dr. Ziernicki has no familiarity with how the Firestone tires were manufactured, nor did he compare the manufacturing process of the Firestone tires to the Michelin process, nor did he compare the design of the tires or the materials used in the tires. Dr. Zernicki's theory that global delamination cannot occur except where there is a manufacturing defect therefore is simply unsupported by any reliable technical or scientific literature or authority presented to this Court, or by any test results, or by any peer review.

Moreover, the Court also rejects Dr. Ziernicki's opinion as unreliable because he never attempted to identify the manufacturing defect that he postulates to have existed. His affidavit specifies the kinds of manufacturing defects that can lead to "adhesion defects" such as incomplete vul-

canization of the uncured tire; and design defects such as "failure to minimize the strain state at the belt edge." Ziernicki Affidavit, ¶ 2.3. Dr. Ziernicki does not hypothesize, or appear to specifically rule out these causes. Rather he states that:

> [T]o determine the exact cause of the adhesion defect would require precise knowledge (on the day the Michelin X tire was manufactured) regarding the manufacturing methods, conditions of the material used at the time of manufacture, design drawings of the intended construction of tire, and statistical analysis of a population of the same tires. Therefore, I concluded that determination of the exact cause of the adhesion defect would not be practical.

Ziernicki Affidavit, ¶ 2.9.

In the Court's view, Dr. Ziernicki's prefatory statement and conclusion do not connect. He never explains why he did not look at, or at least request, the data he specifies in this paragraph. Plaintiffs counsel certainly could have requested, and he could have could have analyzed "statistics" regarding the population of tires manufactured at the same plant during the same period of time, which might have reflected a problem in the manufacturing process. He through plaintiff's counsel certainly could have requested, and opined upon, design drawings for the Michelin X tire that may have revealed a "design defect." Through discovery could have obtained and analyzed information about the raw materials used at the time of manufacture and the manufacturing processes used in 1985. He did not request or examine such information despite his own statement that this information could assist in determining the cause of the supposed "adhesion defect."

Dr. Ziernicki also states in his affidavit that he reviewed literature regarding tread separation that results from manufacturing and design defects, and found a "positive correlation between the physical evidence of tread separation and published literature on defective tires." Ziernicki Affidavit, ¶ 3.10. In the following paragraph of his affidavit he explains that the adhesion between the rubber at the belt edge and the steel cord at the belt edge can be damaged or fail due to mechanical or chemical processes. He explains that mechanical adhesion can breakdown due to "excessive stress or strain at the belt edge" while chemical adhesion can breakdown due to "contamination, poor vulcanization, material selection, or a variety of other factors." Ziernicki Affidavit, ¶ 3.11. However, he never states whether the tire separation here occurred as a result of breakdown of mechanical adhesion or chemical adhesion, and if chemical adhesion, what caused the breakdown. His failure to identify with specificity the alleged cause of the manufacturing defect cannot, on the state of the record here, be attributed to the physical impossibility in so doing.

For the reasons set forth above, this Court finds that the opinion and testimony of Dr. Ziernicki is not sufficiently supported by reliable technical or scientific reasoning, is not supported by literature in the field or test results, and is inherently too unreliable based on his limited qualifications to be put before a jury. If an expert opines as to causation in a product liability case based on a process of elimination approach, he or she needs to be an expert as to the remaining theory using a reliable methodology justifying it as the sole cause. Defendant's motion *in limine* is GRANTED.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Michelin contends that in order for plaintiff to establish his claim for strict liability he must demonstrate that

the Michelin X tire was defective when it left Michelin's control, citing to *Simon v. Coppola,* 876 P.2d 10, 15 (Colo.App.1993) and *Bartholic v. Scripto–Tokai Corp.,* 140 F.Supp.2d 1098, 1106 (D.Colo.2000). Defendant further contends that in order for plaintiff to establish his claim for negligence, he must demonstrate that Michelin had a legal duty of care to produce tires without defects, and that such duty was breached, citing to *Lyons v. Nasby,* 770 P.2d 1250, 1254 (Colo.1989).

Defendant also asserts that in order for plaintiff to establish his claims for breaches of warranty of merchantability and fitness for a particular purpose, plaintiff must show that at the time of purchase the tire was flawed or defective, in a manner constituting a breach of warranty, citing to *Prutch v. Ford Motor Co.,* 618 P.2d 657, 660 (Colo.1980). (Defendant's Motion for Summary Judgment, at 14, n. 2.)

In his opposition to the motion for summary judgment plaintiff does not "take exception" to the elements for the claims of strict liability and breach of warranty as set forth by defendant, although he states that he prefers the language of CJI 14:17 for the elements of proof of a product liability negligence claim. (*See* Plaintiff's Objection to Summary Judgment, pp. 6–8.) Nonetheless, plaintiff describes his negligence claim as relating to "the negligence of [Michelin] in producing a defective product." (*Id.* at 8.)

Based on these briefs, the parties appear to be in accord that as to each of plaintiff's four claims, he must offer proof that the Michelin X tire was defective as a result of a manufacturing defect and that such defect caused plaintiff's injuries. This Court agrees that under applicable Colorado law the plaintiff must prove a defect in the tire in order to establish his claims for strict liability, negligence and breaches of warranty as stated by the cases cited by defendant and acknowledged by plaintiff.

■ At the *Daubert* hearing, plaintiff's counsel suggested that plaintiff's claim of breach of warranty of fitness for a particular purpose may not require proof of a defect, but may simply require proof of failure of the tire when being used for the particular purpose it is warranted, relying on *Prutch, supra.* This Court disagrees with that suggestion. *Prutch* does hold that in a case where an alleged defectively manufactured product reaches the plaintiff through a distributor, the plaintiff need not prove that the product was defective when it "left the factory." 618 P.2d at 660. Nonetheless, the Court held that the burden is on the plaintiff to establish that a defect arose in the course of the manufacturer-distribution phase of the sale, and before the plaintiff purchased the product. *Id.* Thus, under any reading, *Prutch* requires proof of a defect in cases alleging breaches of warranty, making no distinction between cases for breach of warranty of merchantability and cases alleging breach of warranty of fitness for a particular purpose.

■ Although not specifically raised by defendant, this Court finds that plaintiff's complaint fails to properly state a claim of breach of warranty for a particular purpose. In his fourth claim for relief, plaintiff alleges only that the tire was "warranted to be fit fir [sic] the particular purpose of being an automobile tire." (Complaint, ¶ 35.) Under Colorado law, a warranty of fitness for particular purpose does not arise when a product is purchased for the ordinary purpose for which the device or product is to be used. *See Weir v. Federal Insurance Company,* 811 F.2d 1387, 1393 (10th Cir.1987). In applying Colorado law, the court stated:

988

A reason for purchasing a particular product beyond the ordinary reason for selecting that product must be shown in order to give rise to an implied warranty of fitness for a particular purpose. Purchasing a dryer with the purpose of drying clothes does not explain why one particular dryer was chosen, for all dryers can reasonably be assumed to be suitable for the purpose of drying clothes.

The same can be said for the tire at issue in the present case. Plaintiff alleges no special purpose for this tire other than for use as an automobile tire.

■ Without the opinions of Dr. Ziernicki, plaintiff has no relevant evidence that the Michelin X tire was defective at any time, or specifically that it failed due to a manufacturing defect, a matter that is beyond the ambit of common knowledge or experience of ordinary persons. Plaintiff argues that even absent such expert opinion, summary judgment should be denied because plaintiff can offer as evidence of the "defect" the plain fact that the tire failed, or delaminated. This Court does not agree that is sufficient to avoid summary judgment in this case.

First, in *Shultz v. Linden–Alimak, Inc.*, 734 P.2d 146, 148–49 (Colo.App.1986), the Court held that under the doctrine of strict liability, "the occurrence of an accident in connection with the use of a product does not necessarily make the product defective and unreasonably dangerous." The Court also held that "there can be no recovery under the theory of strict liability without proof of a defect attributable to the manufacturer or seller which was the cause of the plaintiff's injuries. Restatement (Second) of Torts § 402A; (other citations omitted)." *Id.*

Plaintiff argues, nonetheless, that Colorado law allows for proof of product defect through circumstantial evidence, citing to *Union Ins. Co. v. RCA Corp.*, 724 P.2d 80 (Colo.App.1986) and *Oja v. Howmedica, Inc.*, 111 F.3d 782 (10th Cir.1997). (Plaintiff's opposition to Motion *in limine*, p. 8.) While it is correct that the *Union* and *Oja* opinions state that a plaintiff may prove a manufacturing defect by circumstantial evidence, it is apparent to this Court that those statements are based on the particular factual situation that existed in each case, and do not supply a rule for general application.

In both *Union* and *Oja*, the alleged defective product was destroyed or was completely missing after the incident that gave rise to the claims of strict liability, and hence direct proof of a defect was "impossible." 724 P.2d at 83; 111 F.3d at 792. Here, by contrast, the allegedly defective tire is not destroyed or missing. As discussed above, it has been examined by Dr. Ziernicki and in fact it has been presented and shown to this Court. (indeed, Dr. Ziernicki donned gloves as he manipulated the tire, now in two pieces, for demonstrative purposes at the *Daubert* hearing.) Accordingly, the statements made in *Union* and *Oja* regarding the use of circumstantial evidence to support a manufacturing defect claim when the alleged defective product has been destroyed have no application here.

Furthermore, in *Oja*, there was other evidence offered by the plaintiff, unlike the situation in the instant case, that other identical items manufactured at approximately the same time suffered from potential manufacturing defects. *See* 111 F.3d at 792–93. Likewise, in *Union*, there was other evidence in the record that tended to eliminate all other causes of the product failure. *See* 724 P.2d at 83.[3] Moreover,

3. *See also, Weir, supra,* where the opinion references the *Union* decision stating: "The

here the inability to conduct tire testing was not ruled out by a competent expert on tire design and tire manufacturing. For these reasons, this Court finds plaintiff's reliance on *Union* and *Oja* is unavailing here to avoid summary judgment.

This Court agrees with the statement made by plaintiff in his objection to the motion for summary judgment—his case is "founded on the testimony of Dr. Ziernicki." As that testimony has been excluded by virtue of this Court's ruling on the defendant's *Daubert* motion, there is insufficient evidence to allow plaintiff's claims of strict liability, negligence or breach of warranty of merchantability to go to trial.

Accordingly, the defendant's Motion for Summary Judgment is GRANTED.

inference of a defect is permissible whenever the plaintiff has introduced evidence that would exclude other causes of the accident. Such evidence was introduced in *Union Ins. Co.* and in the cases relied upon by the Colorado court in *Union Ins. Co.* (citations omitted)." 811 F.2d at 1392.