Paul MASCARENAS and Gisela Mas-
carenas, as Grandparents and Legal
Guardians of Dominique Gisela Mas-
carenas, Minor Child and sole sur-
viving heir of Gregory Darrell von-
Gartzen; and Annette vonGartzen,
Individually, and as Executrix of the
Estate of Gregory Darrell vonGart-
zen, Plaintiffs

v.

COOPER TIRE & RUBBER
COMPANY and Ford Motor
Company, Defendants.

Case No. 2:08–CV–009.

United States District Court,
S.D. Georgia,
Brunswick Division.

July 24, 2009.

Bruce R. Kaster, Skip Edward Lynch, Kaster & Lynch, PA, Ocala, FL, Richard A. Brown, Jr., Paul Michael Scott, Brown, Readdick, Bumgartner, Carter, Strickland, & Watkins, LLP, Brunswick, GA, for Plaintiffs.

Jason M. Tate, James L. Roberts, IV, Mark David Johnson, Gilbert, Harrell, Sumerford & Martin, PC, Brunswick, GA, Justin T. McDonald, R. Thomas Warburton, Bradley, Arant, Rose & White, LLP, D. Alan Thomas, Gregory L. Schuck, M. Jeremy Dotson, Huie, Fernambucq &

Stewart, LLP, Birmingham, AL, Audrey Kohn Berland, Charles K. Reed, Michael R. Boorman, McKenna, Long & Aldridge, LLP, Atlanta, GA, Arnold C. Young, Hunter, Maclean, Exley & Dunn, PC, Savannah, GA, for Defendants.

## ORDER

ANTHONY A. ALAIMO, District Judge.

No objections thereto having been filed in the time provided in the Order, this Court hereby directs that its Order of June 12, 2009 be unsealed and filed of record in this matter.

## SEALED ORDER

Plaintiffs, Paul Mascarenas and' Gisela Mascarenas on behalf of Dominique Gisela Mascarenas, and Annette vonGartzen on her own behalf and as executrix of the estate of Gregory Darrell vonGartzen, brought this action against Defendants, Cooper Tire & Rubber Company and Ford Motor Company, asserting state law tort claims arising from an automobile accident.

Presently before the Court are Defendants' motions for summary judgment. Defendants' motions will be **GRANTED** in part and **DENIED** in part. In summary, Cooper is entitled to summary judgment on Plaintiffs' manufacturing defect, negligent testing, and misrepresentation claims. Ford is entitled to summary judgment on Plaintiffs' negligent failure to warn claim, and the Court concludes that Plaintiffs do not possess any viable or independent legal claims against Ford under Georgia law based on the theories of negligent testing, inspection, assembly, marketing, advertising, labeling, and misrepresentation. In all other respects, the Court finds that genuine issues of material fact remain in dispute, precluding the entry of summary judgment.

## BACKGROUND

Viewed in the light most favorable to Plaintiffs, the facts are as follows. Around 6:30 a.m. on July 25, 2006, Annette vonGartzen and her stepson, Greg vonGartzen, left their home in Brunswick, Georgia, for a trip to Jacksonville, Florida. Ms. vonGartzen was driving a 2000 Mercury Mountaineer equipped with Cooper tires. The vonGartzens were traveling south on Interstate 95 in Camden County when the tread came off the left rear tire of their vehicle, which caused Ms. vonGartzen to lose control of the vehicle. The Mountaineer left the roadway and rolled over. As a result, Greg vonGartzen died and Annette vonGartzen was injured.

On January 17, 2008, Plaintiffs filed this lawsuit, asserting several claims of liability against Ford and Cooper. Plaintiffs posit that the tire and the sport-utility vehicle were defective in both their design and manufacture, and that the manufacturers are strictly liable therefor. Plaintiffs assert related claims sounding in negligence. The subject tire was a Cooper Discoverer H/T Radial, size P235/75 R15 XL M+S. The 2000 Mountaineer was a "badge twin" (*i.e.*, similar in all material respects) of the Ford Explorer. The testing at issue in this case related to the 1995 to 2001 Explorer/Mountaineer model years.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in his favor[,]" *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal quotation marks omitted).

## DISCUSSION

Both Defendants raise several separate grounds for summary judgment. The Court will first consider the points raised by Cooper, and then analyze Ford's asserted grounds for relief.

## I. Cooper's Liability for Manufacturing and Design Defect and Other Claims

Cooper submits that there is no evidence of a manufacturing defect in the subject tire. Cooper also contends that there is no evidence of a design defect or alternate design that would have prevented the tread separation. Cooper further maintains that Plaintiffs' negligent testing, negligent failure to warn, and misrepresentation claims are barred as a matter of law. The Court will address each argument in turn.

### A. *Manufacturing Defects Relating to the Tire*

■ Plaintiffs' complaint avers eight different manufacturing defects. Dkt. No. 1

at ¶¶ 21–22. As Cooper notes, Plaintiffs' tire failure expert, Dennis Carlson, testified at his deposition that he had no knowledge of any of these eight defects in this case. Dkt. No. 241, Carlson Dep. 223–24 (old rubber stock); *Id.* at 94 (inappropriate exposure to moisture); *Id.* at 224 (use of solvents); *Id.* at 94 & 175 (improper handling of belt wire); *Id.* at 225 (failure to eliminate trapped gas, air, or water in material prior to curing); *Id.* at 94 (improper repairs or inspections); *Id.* at 174 & 224 (improper awling); & *Id.* at 175 & 224 (improper curing or vulcanization). Plaintiffs have not pointed the Court to any evidence of any of these manufacturing defects.

Carlson's deposition does identify an "adhesion defect" in the subject tire. Dkt. No. 241, Carlson Dep. 21–23. But Carlson provided no testimony regarding how such a defect occurred during the manufacturing process. *Id.* at 25. *See Hauck v. Michelin N. Am., Inc.*, 343 F.Supp.2d 976, 981–87 (D.Colo.2004); *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F.Supp. 1353, 1358–60 (D.Ariz.1996)(finding such shortcomings fatal to adhesion manufacturing defect claims). Moreover, Plaintiffs never explain how such a defect relates to the allegations in the complaint regarding the manufacturing defects. The Court concludes that Plaintiffs failed to put Cooper on notice in its complaint of any "adhesion defect" theory. Cooper is entitled to judgment as a matter of law with respect to Plaintiffs' manufacturing defect claims.

### B. *Design Defect Claims Against Cooper*

■ Georgia applies a risk-utility analysis to determine whether a product is defective.

This risk-utility analysis incorporates the concept of "reasonableness," i.e.,

whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk.

*Banks v. ICI Ams., Inc.,* 264 Ga. 732, 735, 450 S.E.2d 671 (1994).

■■ "The essential inquiry, therefore, is whether the design chosen was a reasonable one from among the feasible choices of which the manufacturer was aware or should have been aware." *Id.* at 736, 450 S.E.2d 671 (quoting 2 Am. L. Prod. Liab., supra at § 28:14, p. 28). "[T]he existence and feasibility of a safer and equally efficacious design diminishes the justification for using a challenged design." *Id.* at 735, 450 S.E.2d 671. "Indeed, the reasonableness of choosing from among various alternative product designs and. adopting the safest one if it is feasible is considered the 'heart' of design defect cases[.]" *Id.* at 736, 450 S.E.2d 671. Under *Banks,* other factors to consider include, *inter alia:*

the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance. We note that a manufacturer's

proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its liability for its design of allegedly defective products.

*Id.* at 736 n. 6, 450 S.E.2d 671. In general, weighing the risk-utility factors is a task left to the jury. *Id.* at 735–36, 450 S.E.2d 671.

■■ Carlson has identified three (or four, depending on how they are counted) design defects in the subject tire: (1) lack of a full nylon cap, (2) lack of belt edge gum strips or wedge, (3) inadequate aging resistance consisting of (a) an inadequate antioxidant package, and (b) an inadequate inner liner. Dkt. No. 241, Carlson Dep. 29–30.

Plaintiffs submit that Defendant's competitors employed these reasonable alternatives, and that Cooper's internal documents show that it explored these alternatives, but rejected them to make bigger profits. Dkt. No. 223, Carlson Report, Ex. M, at 13–14; Dkt. No. 241, Carlson Dep. 406–07. According to Carlson, curing any one of these problems would not have rendered the tire non-defective, but making just one of the improvements probably would have prevented the tread belt separation here. *Id.* at 74–76.

Carlson considered, and Plaintiffs have submitted, evidence that the wedge and nylon cap features were reasonable design alternatives widely used in the tire industry. Dkt. No. 224, Ex. 4 at 16–17 & 25; Dkt. No. 224, Ex. 12 at 12; Dkt. No. 224, Exs. 13–14 & 16; Dkt. No. 241, Carlson Dep. 72–76.

Carlson noted that stress at the edge of the belts is a critical element in causing tread belt separation. According to Carl-

son, the use of wedges, also known as gum strips, reduces the stress. Dkt. No. 224, Ex. 4 at 13–14. Plaintiffs have presented evidence that tends to show that Cooper knew that this was a practical alternative design. Dkt. No. 224, Ex. 7. The National Highway Traffic Safety Administration concluded the belt wedge was a critical design feature to suppress belt-edge cracks. Dkt. No. 224, Ex. 8 at 2.

Relatedly, Plaintiffs assert that the tire industry has long known that appropriate anti-degradants, often called an antioxidant package, are needed, and Cooper has evaluated this feature as well. Carlson provided specific design alternatives regarding the inner liner during his deposition. Dkt. No. 241, Carlson Dep. 82–83. Plaintiffs have submitted evidence that tends to show that Cooper knew that the lack of a proper antioxidant package caused tread separation, and that this fact was publicized broadly. Dkt. No. 224, Exs. 11 & 18–26. Plaintiffs' evidence bolsters their theory that Cooper delayed implementing this design improvement because of cost considerations. Dkt. No. 224, Ex. 7.

Carlson explained that the quality of the inner liner is determined by three factors: (1) its gauge or thickness, (2) the chemical compound (most importantly, the percentage of halobutyl), and (3) the manufacturing process. Carlson testified that Cooper's high air permeation rate could be

corrected by increasing halobutyl content and eliminating localized thinning. Dkt. No. 241, Carlson Dep. 240–42. As Plaintiffs suggest, Cooper's Australian website provides some evidence that the manufacturer was aware of the feasibility and importance of this alternate design. Dkt. No. 224, Ex. 10.[1]

Plaintiffs have presented evidence upon which a reasonable jury could find that these design defects caused the tread belt separation and the accident, and that there were feasible, safer alternatives that would have corrected the identified product deficiencies.

### C. Negligent Testing and Misrepresentation Claims against Cooper

Plaintiffs abandoned their negligent testing and misrepresentation claims against Cooper by not pressing those claims in opposition to Cooper's motion for summary judgment. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir.2004). At the summary judgment stage, Plaintiffs cannot rest on their pleadings, but must introduce, or point out, admissible evidence showing the existence of a material fact at issue, when the moving party demonstrates the absence of the same. Plaintiffs have failed to discharge this burden as to these claims.

### D. Negligent Failure to Warn Claim Against Cooper

Under Georgia law, a manufacturer breaches its duty to warn if it fails to

---

**1.** Cooper argues that certain documents relied on by Plaintiffs in opposition to its motion for summary judgment are inadmissible. First, Cooper states that Plaintiffs rely on certain documents produced by Cooper which are unauthenticated and have no direct connection to the specific design of the tire at issue. Second, Defendant faults Plaintiffs for referring to information about other tires and studies done by outside researchers and other tire companies. The Court finds that these

appeals largely miss the mark. First, as Plaintiffs pointed out at. oral argument, the idea that Cooper produced inauthentic documents during discovery is problematic for a few reasons, but there is no specific evidence of that here. Second, the Supreme Court has recognized that it is appropriate for experts to rely on studies and research done by others in the field to validate the expert's approach. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

"(1) adequately communicate the warning to the ultimate user or (2) fails to provide an adequate warning of the product's potential risks." *Thornton v. E.I. Du Pont De Nemours & Co., Inc.,* 22 F.3d 284, 289 (11th Cir.1994). The first failure to warn claim centers on issues such as location and presentation. The focus of the. latter claim is on the content of the warning, inquiring whether the warning is sufficient to apprize the user of the dangers associated with the use of the product.

*Watkins v. Ford Motor Co.,* 190 F.3d 1213, 1219 (11th Cir.1999). Both types of claims usually present questions for the finder of fact to resolve. *Thornton,* 22 F.3d at 289.

Plaintiffs' failure to warn claim is the second type described in *Watkins.* That is, Plaintiffs contend that Cooper failed to warn them of the dangers posed by tread belt separation based on the tire manufacturer's failure to adopt any reasonable safety measures to prevent such hazards, including use of anti-degradants, nylon cap plies, or belt edge gum strips.

Cooper responds that it did warn customers how to use the tires properly and that Plaintiffs failed to identify a "warnings expert." Because Plaintiffs do not present an inadequate communications case, it is irrelevant that Carlson is not a warnings expert. As the Court explains more fully below, Carlson is qualified to explain the risks that Cooper failed to disclose at all. The Court concludes that Plaintiffs' negligent failure to warn claim against Cooper presents a question of fact for the jury's determination.

## II. Cooper Tire's Motion to Exclude Carlson's Testimony

Carlson is a licensed professional mechanical engineer with over thirty years of education, training, and experience. Carlson's opinions and conclusions were derived from several visual and tactile examinations and diagnostic testing of the subject tire. Dkt. No. 223, Carlson Report, Ex. M, at 14. Carlson opines that the tread separation resulted from several design defects, including: (1) lack of a nylon cap plies or overlays, (2) lack of belt wedging or gum stripping, (3) inadequate thin inner liner, and (4) improper aging resistance and inadequate anti-degradants, or an antioxidant package. *Id.*

Cooper has moved to exclude Carlson's testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Federal Rules of Evidence provide that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

■■ Under *Daubert* and its progeny, a federal trial judge plays an important role as a gatekeeper in determining the admissibility of expert opinions at trial. *Kumho,* 526 U.S. at 143–50, 119 S.Ct. 1167. The plaintiff bears the burden of showing that the expert is qualified under *Daubert. United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004).

■ The Court considers several non-exhaustive factors in ruling on a *Daubert*

motion to exclude expert testimony. Such factors that may be considered include: whether a "theory or technique ... can be (and has been) tested[,]" whether it "has been subjected to peer review and publication[,]" whether there is a high "known or potential rate of error[,]" whether there are "standards controlling the technique's operation[,]" and whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786 (1993). The touchstones of the inquiry are the reliability and relevancy of the expert's testimony. *Id.* at 599, 113 S.Ct. 2786 (Rehnquist, C.J., concurring in part and dissenting in part); *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167.

As the parties note, the Supreme Court's decision in *Kumho* concerned tread separation testimony offered by Carlson. The Supreme Court found no abuse of discretion in the district court's exclusion of Carlson's opinion that the tread separation in that case was caused by a defect "[d]espite the tire's age and history." *Id.* at 143 & 153–58, 119 S.Ct. 1167. In contrast, Carlson testified in this case that he did not find that the subject tire showed any evidence of impact or overdeflection. *Kumho*, 526 U.S. at 144 & 154, 119 S.Ct. 1167. In finding that the cause of the failure was a result of design defects, Carlson considered and eliminated other possible causes. Dkt. No. 241, Carlson Dep. 96–99, 107–08, & 139.

■ Contrary to Cooper's characterization of Carlson's testimony, Carlson testified during his deposition that not all tread belt separations are due to defective design or manufacture. Carlson stated that, in his opinion, the great majority of such tire failures that occurred during the time period relevant to this lawsuit *are* the manufacturer's fault, but that he would have to make an individual inspection of a tire to reach a conclusion in a particular case. Dkt. No. 241, Carlson Dep. 103–05.

■ In determining whether evidence is reliable, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. Where experts might reasonably reach different conclusions based on the evidence, their opinions should be admitted into evidence. *Kumho*, 526 U.S. at 153, 119 S.Ct. 1167. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

Visual and tactile examinations like Carlson completed are a valid and common way for tire failure experts to reach their conclusions regarding causation. *Kumho*, 526 U.S. at 156, 119 S.Ct. 1167. Cooper's experts, and Ford's experts, use these same procedures. Dkt. No. 223, Ex. L, Campbell Dep. 138–40; Dkt. No. 223, Ex. Q, Baldwin Report 2; & Dkt. No. 223, Ex. R, Grant Report 2–5.

Carlson also performed diagnostic testing of the inner liner with a proscope, a type of microscope. Dkt. No. 241, Carlson Dep. 311–12. Carlson x-rayed the tire and tread pieces. *Id.* at 162–63. Carlson shearographed (a form of non-destructive testing) and studied the companion tires. *Id.* at 20. Carlson performed a quantitative assessment of exemplar Cooper tires via a cross-sectional analysis. *Id.* at 225. Carlson made tire cuts of similar tires. *Id.* at 416. Moreover, Carlson relied on his personal visits to Cooper's manufactur-

ing plants, including the one in Texarkana, Arkansas, where the subject tire was made. *Id.* at 48–49. Carlson reviewed a number of Cooper's documents. *Id.* at 405. Carlson relied on testing by other experts and industry sources on radial tires, as well as expert literature on the topic. Dkt. No. 223, Ex. M, Carlson Report at 16–23; Dkt. No. 241, Carlson Dep. 68–70 & 234–35. Carlson brought these materials to his deposition. The absence of such supporting references was remarked upon in the Supreme Court's decision in *Kumho*, 526 U.S. at 157, 119 S.Ct. 1167.

■■■ As Plaintiffs note, Carlson does not have to publish to be qualified as an expert. Rather, the scientific theory or technique must have been subject to peer review and publication. *E.g., Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3rd Cir.1997). Carlson's techniques have long been generally accepted in the tire manufacturing industry. Under Rule 702, an expert can be qualified by a combination of their knowledge, skill, experience, and training.

> [T]he *Daubert* gatekeeping function of trial courts was not meant to force product liability plaintiffs to obtain as experts inventors or designers of new and improved products in order to succeed in products liability litigation. Product design is achieved over many years of research and testing by corporate Research and Development Departments and only after the expenditure of huge sums of money and manpower. Such testing expenditures would be cost prohibitive for the vast majority of plaintiffs. To require physical testing of an expert's opinion before the expert is permitted to testify would mean the elimination of product liability suits by ordinary non-corporate citizens. No ordinary citizen could afford such prohibitive up front litigation costs.

*Traharne v. Wayne/Scott Fetzer Co.*, 156 F.Supp.2d 697, 712–13 (N.D.Ill.2001).

The Court concludes that Carlson's testimony will be helpful to the jury. It is relevant and reliable, and Cooper is not entitled to judgment as a matter of law based on its *Daubert* argument.

## III. Cooper's Mileage and Age Argument

According to Cooper, the subject tire was worn heavily, and cannot be found to be defective as a matter of law.

■■■ To establish a product liability claim under Georgia law, a plaintiff "must show that the product, when sold, was not merchantable and reasonably suited to the use intended and its condition when sold is the proximate cause of the injury sustained." *Owens v. Gen. Motors Corp.*, 272 Ga.App. 842, 845, 613 S.E.2d 651 (2005)(*quoting Williams v. Am. Med. Sys.*, 248 Ga.App. 682, 683, 548 S.E.2d 371 (2001)); Ga.Code Ann. § 51–1–11(b)(1). Georgia's product liability statute "imposes a strict liability on the manufacturer. The liability may be incurred irrespective of negligence, privity of contract, warranties, or exclusions." *Firestone Tire & Rubber Co. v. Pinyan*, 155 Ga.App. 343, 350, 270 S.E.2d 883 (1980).

Whether the alteration was substantial, and foreseeable by the manufacturer, are usually questions for the jury to decide. *Moore v. ECI Mgmt.*, 246 Ga.App. 601, 607, 542 S.E.2d 115 (2000). Ordinary "wear and tear" is not an alteration or misuse of the product that bars recovery as a matter of law.

 In the instant case, there is no evidence that "the original design of the manufacturer's product has been totally eliminated and replaced[.]" *Talley v. City Tank Corp.*, 158 Ga.App. 130, 135, 279 S.E.2d 264 (1981). Plaintiffs have presented evidence on which a reasonable jury could find that the tire should not. have failed, even though it was five and a half years old and had been driven about 68,-000 miles when the tread belt separation occurred. *E.g.*, Dkt. No. 241, Carlson Dep. 377. Plaintiffs' expert found no evidence that the subject tire showed any signs of improper maintenance, underdeflation, or overloading.

Summary judgment is not warranted in favor of the tire manufacturer on this theory.

## IV. Plaintiffs' Claim for Punitive Damages Against Cooper

The award of punitive damages is governed by Georgia Code section 51–12–5.1(b), which provides:

> Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

 As a general rule, punitive damages are not appropriate in cases where a manufacturer complies with regulatory standards. *Stone Man, Inc. v. Green*, 263 Ga. 470, 471–72, 435 S.E.2d 205 (1993); *Welch v. Gen. Motors Corp.*, 949 F.Supp. 843, 845–46 (N.D.Ga.1996). However, that rule is not hard and fast, particularly where the manufacturer's conduct shows some wanton or otherwise culpable

behavior. Cooper cannot escape liability for punitive damages as a matter of law just because it complied with the applicable federal safety standards. *Gen. Motors Corp. v. Moseley*, 213 Ga.App. 875, 885, 447 S.E.2d 302 (1994).

Plaintiffs insist that Cooper knew it was placing its customers in substantial risk of harm. Plaintiffs contend that Cooper knew the defects caused tread belt separations, and refused to implement simple, relatively inexpensive solutions. Plaintiffs have presented some evidence that Cooper knew of the four design defects in 1996. Dkt. No. 225, Ex. 1.

Carlson testified that if one of the four safety measures had been incorporated in the subject tire, the tread separation, and Greg vonGartzen's death, probably would not have occurred. There is some evidence that other tire manufacturers adopted these safety measures starting in the 1960s, that they were widely used in the 1980s, and that Cooper rejected these safer design alternatives.

In short, Plaintiffs have pointed to evidence that Cooper knew that each of these design features prevented tread separations, but that Cooper decided against such changes because they cut into Cooper's profit margin. Cooper's motion for summary judgment as to Plaintiffs' claim for punitive damages is rejected at this time. *Woodard v. Ford Motor Co.*, 1:06–CV–2191–TWT, 2007 WL 4125519 at *4 (N.D.Ga. Nov. 2, 2007).

## V. Plaintiffs' Negligent Failure to Warn Claim Against Ford

Like Plaintiffs' negligent failure to warn claim against Cooper, Plaintiffs' like claim against Ford is *not* an inadequate communication claim. Rather, Plaintiffs complain

that the Mountaineer's visor warning did not mention the stability and handling/skate risks posed by the automobile at all. The visor did warn drivers of a "higher rollover risk," and cautions that drivers should "avoid abrupt maneuvers and excessive speed." Dkt. No. 201, Exs. C & D.

■■■ Negligent failure to warn claims do not always present jury questions. In plain cases, summary judgment is appropriate. *Copeland v. Ashland Oil, Inc.*, 188 Ga.App. 537, 538–39, 373 S.E.2d 629 (1988); *Ontario Sewing Mach. Co. v. Smith*, 275 Ga. 683, 687, 572 S.E.2d 533 (2002). In a negligent failure to warn case, a plaintiff must show proximate cause. *Powell v. Harsco Corp.*, 209 Ga. App. 348, 350, 433 S.E.2d 608 (1993). Ford submits that Plaintiffs have failed to do so. The Court agrees. There is no evidence that Plaintiffs would have modified their behavior even if Ford had provided an adequate warning.

■■■ Annette vonGartzen testified that she did not read the instruction manual. Ms. vonGartzen did testify that she read the visor warning. Significantly, though, she could not remember if she had read such warnings on the Mountaineer or on a different vehicle that she owned or drove. Dkt. No. 186, vonGartzen Dep. 97–98. Construing Ms. vonGartzen's testimony to conclude that she read the visor warning on the Mountainer is especially suspect given that the warning she described—about leaning the seat back—has nothing to do with the warnings actually found on the subject vehicle. *Id.* at 98.

Again, Plaintiffs stress that they are not challenging the adequacy of Ford's efforts to communicate the warning, just the warning itself. Plaintiffs assert that their claim is premised on Ford's failure to give a complete disclosure of the risks involved.

> Georgia courts have held that a plaintiff's failure to read a warning printed on a product constitutes contributory negligence and precludes recovery against the product's manufacturer ... Thornton contends that the communication of the warning in addition to the warning itself was inadequate., therefore, his failure to read said warning does not bar recovery. Failure to read a warning does not bar recovery when the plaintiff is challenging the adequacy of the efforts of the manufacturer or seller to communicate the dangers of the product to the buyer or user.

*Thornton,* 22 F.3d at 289–90 (internally cited cases omitted).

Because Plaintiffs do not raise an inadequate communication claim, "[i]t is unclear what [Ford] would be required to do in order to communicate the warning to [von-Gartzen] on this particular occasion." *Id.* at 290. Ms vonGartzen's failure to read the warning bars this claim as a matter of law. *See also Reynolds v. Gen. Motors Corp.,* 2:04–CV–0106–RWS, 2007 WL 2908564, at *11 (N.D.Ga. Sept. 28, 2007).

## VI. Stability Claim Relating to the Mountaineer

Ford maintains that roll stability is not at issue in this case. According to Ford, a stability defect averment is distinct from the handling defect allegations identified by Plaintiffs' expert witnesses. Plaintiffs' vehicle dynamics expert, Dr. Renfroe, stated that the design defect claim at issue is handling, or skate, not stability or resistance to rollover. Dkt. No. 216, Ex. A at 4. Renfroe agreed that these two defects are distinct. Dkt. No. 216, Ex. B, Renfroe

Dep. 76 (*Becerra v. Bridgestone/Firestone, Inc.*, Case No. 324907–401, Probate Court, Harris County, Tex. (July 28, 2003)). According to Ford, when a vehicle—like the subject Mountaineer—is involved in an off-road, "furrow trip" rollover, neither Renfroe nor any other expert can opine that stability was a proximate cause of the crash.

▮▮▮ Plaintiffs respond that "longitudinal stability" (as opposed to lateral stability) was a factor in the accident sequence. Renfroe explained that he believes the subject vehicle had stability defects, and that he will testify about that, as it relates to the Mountaineer's handling defects. Dkt. No. 177, Renfroe Dep. 24–26. Renfroe testified that the Mountaineer's propensity to rollover played a part in the accident sequence, whether there was actually two wheel lift or not. *Id.* Accordingly, the Court rejects Ford's contention that Renfroe's opinion about stability defects in the subject Mercury would be speculative, and subject to exclusion under *Daubert.* Genuine issues of material fact remain in dispute as to the Mountaineer's roll stability and its impact on the accident.

## VII. The Decedent's Pain and Suffering Claims

▮▮▮ Under Georgia law, in wrongful death cases, there is "no requirement that the physical injury precede the mental pain and suffering." *Monk v. Dial,* 212 Ga.App. 362, 362, 441 S.E.2d 857 (1994). "For pre-impact pain and suffering to be awarded, the jury must have some evidence that the deceased at some point in time was conscious of [his] imminent death; the jury may infer such consciousness from evidence immediately prior to impact or following her injury." *Dep't of Transp. v. Dupree,* 256 Ga.App. 668, 680,

570 S.E.2d 1 (2002). "[F]rom evidence that the decedent's vehicle veered shortly before the collision, the jury could infer that decedent was aware of the impending crash, and from these circumstances-could extrapolate the probable mental state of decedent in that last moment of consciousness." *Monk,* 212 Ga.App. at 362, 441 S.E.2d 857.

The evidence in this case is sufficient to allow the jury to find that Greg vonGartzen was aware of the impending collision. Dkt. No. 186, vonGartzen Dep. 43–44. Whether Greg vonGartzen experienced compensable pain and suffering before,' during, or after the rollover accident that caused his death is a jury question.

## VIII. Duplicative Theories of Recovery Against Ford

In addition to Plaintiffs' products liability claims asserted against Ford, their complaint also asserts separate claims for negligent testing, inspection, assembly, marketing, advertising, labeling, and misrepresentation. According to Ford, summary judgment is proper as to these claims because they are cumulative of the claims already asserted by Plaintiffs. "There are three general categories of product defects: manufacturing defects, design defects, and marketing/packaging defects." *Banks v. ICI Ams., Inc.,* 264 Ga. 732, 733, 450 S.E.2d 671 (1994).

▮▮▮ The Court will first address Plaintiffs' claims for negligent inspection, testing, and assembly. The Eleventh Circuit has noted that "Georgia does not recognize a cause of action for negligent testing." *Villegas v. Deere & Co.,* 135 Fed.Appx. 279, 281 (11th Cir.2005). In contrast, the Georgia Court of Appeals has recognized that recovery may be had on a theory of

negligent inspection under Georgia law. *Buchan v. Lawrence Metal Prods., Inc.,* 270 Ga.App. 517, 521, 607 S.E.2d 153 (2004). As the parties' citations to cases from across the country make clear, these sorts of claims exist in various formulations, and recovery may be had for such claims, regardless of their nomenclature or classification within the various states' tort law regimes. Plaintiffs have offered reports and testimony of its experts, Mickey Gilbert and David Renfroe, to explain Ford's alleged failures in these particulars.

Nonetheless, as the Georgia Supreme Court recognized implicitly in *Banks,* under Georgia law, these sorts of claims are subsets of other sorts of product defect claims. Yet, Plaintiffs' theories suggesting that Ford tested and inspected the 1995 to 2001 Explorer/Mountaineer model improperly will not confuse the jury. Rather, Plaintiffs' evidence in that respect helps explain Plaintiffs' negligent manufacturing product liability claims against Ford, and will assist in the jury's comprehension of Plaintiffs' claims.

██ With respect to the other claims, the Court concludes that Plaintiffs abandoned any (independent) claims they may have had for negligent marketing, advertising, labeling, distribution, and misrepresentation by not pressing those claims in opposition to Ford's motion for summary judgment. *See Access Now, Inc.,* 385 F.3d at 1330.

## IX. Plaintiffs' Punitive Damages Claim Against Ford

Ford posits that it is entitled to summary judgment as to Plaintiffs' punitive damages claim based on a lack of evidence that it acted with the requisite intent. Plaintiffs rejoin that there is ample evidence of Ford's knowledge, which would permit an award of punitive damages in this case.

In separate litigation in Florida, one of Ford's lead design engineers, James Mason, was deposed on January 8, 2003. During that deposition, Mason admitted writing a memorandum urging that the subject vehicle be lowered, widened, and that the roll stiffness be increased. Additionally, Mason agreed that these suggestions were not implemented by Ford's management. Dkt. No. 236, Mason Dep. 43–49 (*Hall–Edwards v. Ford Motor Co.,* Case. No. 99–9450–CA–22 (11th Jud. Cir., Dade Co., Fla.)). Mason testified that the recommendations could not be accomplished in the time frame desired by management. *Id.* at 75. Plaintiffs assert that this decision maximized profits, but compromised public safety.

Plaintiffs' evidence suggests that, instead of making structural changes to improve safety, Ford changed the tire size and air pressure ratings, with negligible effect. Plaintiffs presented evidence suggesting that Ford lowered the rear of the vehicle a half an inch and used 26 psi in the tires, but continued to get poor results. The original tire size was supposed to be the P215 tire. As the 1990 Explorer rollout date was approaching in the spring of 1990, Ford's marketing department began lobbying for larger tires, which made the vehicle higher, and less stable. Consequently, P235 tires were offered as an option, and an overwhelming majority of the vehicles were sold with size P235 tires.

██ In August 1989, the Explorer failed J-turn tests at Ford's Arizona proving grounds with 35 psi in the P235 tires. As a result, approval of the 1995 to 2001 Explorer/Mountaineer model was based on

a computer simulation rather than real world testing. The final sign off on the Explorer was based on ADAMS computer modeling performed by Firestone engineer Francis J. Figliomeni. Dkt. No. 235, Figliomeni Dep. 197–201 (*In re Bridgestone/Firestone, Inc.*, Case Nos. IP 00–9373 & MDL No. 1373 (S.D.Ind. Nov. 12, 2001)). There is evidence from which a reasonable jury could find that Ford manipulated the design and testing of the Explorer/Mountaineer to make it seem more stable, and safer, than it actually was.

 Ford also argues that punitive damages cannot be recovered in a wrongful death claim under Georgia Code section 51–4–2. *Engle v. Finch*, 165 Ga. 131, 134, 139 S.E. 868 (1927). Plaintiffs agree, but note that this claim was brought by Mrs. vonGartzen as executrix of the estate, as part of a survivorship action. Ga.Code Ann. §§ 9–2–40 & 9–2–41; *Velez v. Bethune*, 219 Ga.App. 679, 679–81, 466 S.E.2d 627 (1995).

Thus, punitive damages may be recoverable against Ford. The Court will not grant Ford's motion for summary judgment as to the punitive damages claim at this time, and will reserve consideration of Ford's constitutional arguments, pending the award of any such damages in the instant case.

### CONCLUSION

For the reasons explained above, Defendants' motions are **GRANTED** in part and **DENIED** in part. Cooper's motion for summary judgment with respect to Plaintiffs' manufacturing and design defect and other claims is **GRANTED** in part and **DENIED** in part. Dkt. No. 164. Cooper's motion for summary judgment to exclude the testimony of Plaintiffs' pro-

posed expert, Carlson, is **DENIED.** Dkt. No. 166. Cooper's motion for summary judgment for lack of defect based on the mileage and age of the subject tire is **DENIED.** Dkt. No. 163. Cooper's motion for summary judgment on Plaintiffs' claim for punitive damages is **DENIED.** Dkt. No. 161. Ford's motion for partial summary judgment is **GRANTED** in part and **DENIED** in part. Dkt. No. 167.

Magistrate Judge James E. Graham entered a comprehensive protective order in this case to protect Defendants' trade secrets. Consequently, much of the evidence submitted by the parties in support of, or in opposition to, the motions for summary judgment has been sealed and marked confidential. To protect against accidental disclosure of private information, the Court **ORDERS** that this order be sealed for a period of ten days from the date of this order. Within that time period, any party can object to the unsealing of this order, or any portion thereof. Thereafter, the Court will unseal the order or a portion of it, after considering any objections thereto. *See* Dkt. No. 164, Ex. F, *Griego v. Ford Motor Co.*, CV496–87, Order of Dec. 10, 1998 (Edenfield, J.).